# EXHIBIT

# C

16

1  Now, I think it's proper for me to give you one final
2  note of caution; and that's that no statement, ruling, or remark
3  or comment that I may make during the course of the trial is
4  going to be intended to suggest to you what your verdict should
5  be at the end of this trial. That's going to be solely up to
6  you based on the instructions that I give you.
7  Now that I've explained where we're going and how we
8  will proceed, it's time for the lawyers to address you in
9  opening statement. I ask you to give them your careful
10 consideration and your careful attention. The government goes
11 first.
12 Mr. Brown.
13 MR. BROWN: Thank you, Your Honor.
14 Ladies and gentlemen, the two individuals that are
15 sitting over at the defendants' table represent a pipeline of
16 drugs that begins in Phoenix, Arizona, and ends in Montgomery,
17 Alabama.
18 My name is Todd Brown. I'm an assistant U.S. attorney,
19 and I represent the United States --
20 THE CLERK: Judge --
21 MR. BRUNER: Your Honor --
22 THE CLERK: They can't hear. The interpreters can't
23 hear.
24 The interpreters can't hear you. You have to use the
25 microphone.

17

1  THE COURT: You will need to use the lectern.
2  INTERPRETER: Or either louder. You could speak a
3  little louder.
4  THE COURT: Either speak louder or speak into the mike.
5  MR. BROWN: I'll speak louder.
6  We apologize for that. We have two interpreters here
7  because of one of the defendants not being able to speak
8  English. So I don't mean to yell at you, but I want to speak to
9  you this way as opposed to being locked down behind that
10 lectern. So don't think I'm screaming at you. I don't mean to
11 be.
12 My name is Todd Brown. And I represent the United
13 States, along with my cocounsel, Terry Moorer. Mr. Moorer was
14 not at jury selection, but his name was announced, and so I want
15 you to put a name with a face. Also seated at counsel table is
16 Agent David DeJohn, who works with the Drug Enforcement
17 Administration and is also assigned to the Prattville Police
18 Department.
19 It's our job, mine and Mr. Moorer's job, to prove to
20 you beyond a reasonable doubt the charges with which the
21 defendants are charged. As Judge Albritton has already told
22 you, these charges come by way of an indictment, and I'm holding
23 a copy of the indictment. And as Judge Albritton has already
24 told you, the indictment in this case is not evidence.
25 It does two things. The first thing it does is it

18

1  charges somebody with a crime. A federal grand jury gets
2  together, and they develop an indictment. And that's how
3  somebody comes before you today. The second thing it does, and
4  more importantly -- and the reason why you'll carry a copy of
5  this back with you to the jury deliberation room -- is this sets
6  forth those things that we have to prove to you beyond a
7  reasonable doubt.
8  And what are those things? We've got on the screen
9  count one of the indictment. Count one of the indictment
10 charges the defendants with conspiring with one another and with
11 other persons to distribute a certain kind of drug, a controlled
12 substance; in this case, methamphetamine. It's also important
13 to know --
14 I feel like I'm a talk show host or something. Does
15 that help? All right. Now, I'm not going to sing anything to
16 you. I'm only going to tell you what I expect the evidence to
17 show.
18 Count one of the indictment charges the defendants with
19 that conspiracy count. And I've already told you how it relates
20 to the distribution of a certain kind of drug. There's also
21 going to be an opportunity for you, if you find the defendants
22 guilty at the end of the case, to annotate the amount of drugs
23 in the case. In this particular case, the defendants are
24 charged with 500 grams or more of methamphetamine.
25 Count two of the indictment charges the Defendant Ortiz

19

1  with possession with intent to distribute and distribution of
2  500 grams or more of methamphetamine.
3  And finally, count three charges Michael Marks, the
4  defendant, with possession of 50 grams or more of a detectable
5  amount of methamphetamine. And as the evidence is presented in
6  trial, you'll understand the difference between the weights and
7  the quantities that are charged with each individual count.
8  How do we expect to prove these things to you? We have
9  to do that through what's called evidence. And Judge Albritton
10 has already told you that evidence comes from a couple of
11 different places. First, it's going to come from a number of
12 objects that we have, documents and other kinds of objects. And
13 it's also going to come from testimony from the witness stand
14 and the testimony from the witnesses that will be seated at that
15 chair right there where you can observe them, hear their
16 testimony, and see their credibility.
17 We expect the evidence to show that sometime beginning
18 in the -- around the summer of 2003, an individual by the name
19 of Frank Lara began to send methamphetamine to Montgomery,
20 Alabama, where it would be distributed. We expect the evidence
21 to also show that Frank Lara sometimes came by himself. Lara
22 sometimes came with other people and on other occasions sent
23 other individuals on his behalf to deliver the methamphetamine
24 to this area.
25 One such occasion happened back on October the 8th of

20

1  last year. On October the 8th of last year, agents became aware
2  of the fact that Frank Lara was delivering a quantity of
3  methamphetamine from Arizona to Montgomery, Alabama. Agents
4  began to conduct surveillance. They had information that the
5  person that was going to receive the drugs in Montgomery was a
6  person by the name of Anibal Gutierrez, who is listed in the
7  conspiracy count, and that the vehicle that was going to be
8  driven to Montgomery was a green pickup truck previously known
9  by the agents to be driven by Frank Lara.
10      Agents conduct surveillance of both Anibal Gutierrez's
11 residence as well as a lookout for the green pickup truck. The
12 green pickup truck was ultimately found at a Days Inn hotel on
13 the east side of town where a license plate was observed
14 belonging to a person by the name of Rebecca Lara, who turns out
15 to be Frank Lara's mother. Agents also learn that Anibal
16 Gutierrez procured the room -- went and got the room -- for the
17 people who were in the vehicle. Later it was found that the
18 people in the vehicle were Gelacio Maturano Rodriguez, who was
19 the driver of the vehicle, and the Defendant Sergio Ortiz
20 Alcantar, who was the passenger in the vehicle.
21      During the course of the trial, you're going to hear us
22 refer to some Spanish names. Their last names are hyphenated,
23 and the appropriate way of referring to someone who has their
24 last names in such a way is to refer to the first part of their
25 last name. That's the way not to be rude, is to use their first

21

1  part. So you will hear us refer to Mr. Ortiz Alcantar as
2  Mr. Ortiz throughout the trial as well.
3      After agents began to observe what was going on at the
4  hotel room, they obtained a search warrant for both the vehicle
5  and the hotel room and ultimately found in a hidden compartment
6  in the -- in the truck, in the firewall of the truck, two --
7  approximately two pounds of methamphetamine. At the same time,
8  agents were conducting surveillance at Mr. Gutierrez's
9  residence. And at Mr. Gutierrez's residence, they observed
10 another individual by the name of Willie Theriot, who is also
11 named in the indictment -- observed him come to Mr. Gutierrez's
12 residence, go into a -- it's a trailer -- go in for a period of
13 time and then come out.
14      Mr. Theriot then goes to his own residence where
15 another individual by the name of Dudley Markham shows up at
16 that residence. A drug transaction takes place there. Then
17 Mr. Markham and Mr. Theriot leave at the same time. Mr. Theriot
18 had previously been contacted by Mr. Marks about purchasing two
19 ounces of methamphetamine for approximately $2400.
20      Mr. Theriot goes back to his place of employment, which
21 is Moody Sports Bar, located on the east side of town. After a
22 while, Mr. Marks comes to Moody Sports Bar where Mr. Theriot is
23 working. Mr. Theriot and Mr. Marks go outside to Mr. Theriot's
24 vehicle where the two ounces of methamphetamine are located.
25 They go to the car. Mr. Theriot has the methamphetamine, and

22

1  agents observe the transaction either occurring or about to
2  occur, move in on the two, Mr. Theriot and Mr. Marks, and arrest
3  them both for that methamphetamine.
4      Ladies and gentlemen, at the end of the case, we'll
5  have an opportunity to come back again and make what's called
6  closing arguments before you go back into the deliberation room
7  and decide whether the defendants are guilty or not guilty. So
8  we'll have another opportunity to come and talk to you. But I
9  anticipate that after the evidence is presented in this case,
10 that you will find that the transactions occurred in that
11 fashion where Frank Lara, either through other people or by
12 himself, distributed the methamphetamine to another level of
13 people here in Montgomery and ultimately to Willie Theriot and
14 Michael Marks, who are at the end of that pipeline that I talked
15 to you about when we first started. And when you find that
16 evidence to be the case, the government would expect that you
17 would find the defendants guilty of all counts in the
18 indictment. Thank you.
19      THE COURT: All right. Mr. Bruner?
20      MR. BRUNER: Thank you, Your Honor.
21 Can y'all hear me all right?
22      Ladies and gentlemen, I've met you once before. My
23 name is Ben Bruner, and I represent Mr. Ortiz. Mr. Poti here
24 represents Mr. Marks.
25      You see they've got a lot of bells and whistles in

23

1  here. I'm afraid I'm kind of old school and I grew up when we
2  didn't have that, so you won't see me using this kind of thing a
3  lot. I'm not real good at it. So if I do have to use it and
4  put something on upside down or something, please bear with
5  me -- which I've done before.
6      The way I learned to practice law -- and what I'm going
7  to ask you to do -- is focus your attention on that witness
8  chair right there. That's where the evidence comes from.
9  Mr. Brown's right. There's two kinds of evidence. There's
10 physical evidence. And we expect them to bring in drugs or
11 papers or whatever, and you're going to see that. But there's
12 also testimonial evidence up here. And that's where you have to
13 look and listen to what people say. You also have to decide if
14 you want to believe them or not. Just because they get up there
15 doesn't mean you have to believe them.
16      What we do in opening statements is talk about what we
17 expect the evidence to show. The evidence about Mr. Ortiz is
18 Mr. Ortiz was arrested and he was charged. But you're going to
19 see people sit on this witness stand, and you're going to hear a
20 lot of speculation. Speculation means we're guessing. They saw
21 him here. Didn't see him really do anything. He was there.
22      The government's going to ask you to draw inferences in
23 the case. We expect to see that. What we would contend is what
24 you're going to be asked to do is speculate, is to guess what
25 someone did in this matter. Mr. Ortiz was arrested. We're not

United States of America v. Sergio Ortiz Alcantar and Michael R. Marks                April 5, 2004

64

1  doesn't reflect it, but --
2  Q. Do you know generally where that is, though, and can you
3  show that generally on the map?
4      MR. BRUNER: Judge, I believe he's testified he doesn't
5  really know. If he's guessing, I think he's guessing.
6      THE COURT: All right. If you're reasonably certain
7  where it is, you can show. But don't guess.
8  A. I've seen it on a map, but I can't -- I would be guessing on
9  this map. But I believe it's from the middle to the east -- you
10 know, to the eastern side of New Mexico.
11 Q. The purchase that's shown on Government Exhibit #16 and the
12 issuance of the ticket on Government Exhibit #10, approximately
13 how far apart, timewise, do those two events occur?
14     MR. BRUNER: Objection. That's -- he's asking him for
15 evidence that he doesn't know, unless he can testify as to what
16 the documents state.
17     THE COURT: I understood that's what he was asking, as
18 to what the documents show on the time.
19     MR. MOORER: Yes, sir, and the difference -- how long a
20 time period elapsed between the receipt being shown here and the
21 ticket, the time that's shown on the ticket.
22     THE COURT: Between the times shown on both documents?
23     MR. MOORER: That's correct, Your Honor.
24     THE COURT: Overruled on that basis.
25 A. I believe the -- the ticket is somewhere in between eleven

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

65

1  and twelve o'clock at night on the 6th. The -- excuse me. The
2  receipt. And the ticket, the warning ticket, indicates just
3  after twelve noon on the 7th. So you're looking somewhere
4  around -- roughly, around a 12-hour period.
5  Q. Now, you testified a moment ago about the various documents
6  that you found within the hotel room, such as Government Exhibit
7  #3, #4, and so on. And I'm going to start with Government
8  Exhibit #6. Why did you take Government Exhibit #6 into your
9  custody for presentation in court here today?
10 A. It shows that this particular vehicle, the 1995 Dodge
11 Dakota, had been in Montgomery, Alabama, approximately -- on
12 October the 1st, 2003, and had some repair work done.
13 Q. Had you talked with other individuals about Mr. Lara's
14 activities around this time frame?
15 A. Yes.
16 Q. And did any of those conversations relate to him being
17 present here around that time frame? Mr. Lara.
18 A. Yes.
19 Q. Now, I'm also going to show you Government Exhibit #8, which
20 was previously admitted, a Pennzoil receipt. Do you see that?
21 A. Yes.
22 Q. Why did you take Government Exhibit #8 into your custody?
23 A. It shows that this particular vehicle had work in Mesa,
24 Arizona. It was signed by Frank Lara. What I found interesting
25 was that it used -- the numbers on the customer address,

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

66

1  customer information, was 985 East Gardenia, which his address
2  is actually 985 East Nardina -- Nardini. Whether -- I don't
3  know whether there was a typographical error or intentional
4  deception on Mr. Lara's part, but I found that interesting.
5  Q. I'm showing you Government Exhibit #9, which was previously
6  introduced. And Exhibit #9 is a T-Mobile receipt, I believe you
7  said, in Mr. -- inside the truck that you searched on October
8  the 8th?
9  A. Yes.
10 Q. Why did you take Government Exhibit #9 into your custody?
11 A. Once again, it showed Frank Lara having an interest in that
12 vehicle, because his paperwork was inside the vehicle. It
13 showed that he paid for a phone bill while in Montgomery --
14     MR. BRUNER: Judge, I think this document speaks for
15 itself. And he's going outside the scope of that document at
16 this point into speculation.
17     THE COURT: Overruled.
18 A. It shows that a bill was -- the bill was paid on August 1st,
19 2003, at a T-Mobile location here in Montgomery, Alabama.
20 Q. And were you receiving information that Mr. Lara was in
21 Montgomery during that time frame?
22 A. Yes.
23 Q. And I'm also showing you Government Exhibit #7. Do you see
24 Government Exhibit #7?
25 A. Yes.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

67

1  Q. What is Government Exhibit #7?
2  A. It's an Arizona motor vehicle registration. It's the
3  registration.
4  Q. And why did you take Government Exhibit #7 into your
5  custody?
6  A. It has all the tag information, the VIN number for the
7  vehicle. It also showed that the registered owner of the
8  vehicle was Rebecca Lara, with the same address as Frank Lara.
9  Q. Agent DeJohn, as a DEA agent do you, in your experience,
10 have occasion to intercept drugs which are being taken by
11 courier from one location to another?
12 A. Yes.
13 Q. And based on your training and experience in that portion of
14 your job as an investigator, what has been your experience as
15 far as the registration of vehicles that couriers use?
16     MR. BRUNER: Judge, I object. I don't believe that's
17 sufficiently specific enough.
18     THE COURT: All right. Tighten the question up a
19 little bit, Mr. Moorer.
20     MR. MOORER: Yes, Your Honor.
21 Q. When you conduct drug investigations, do you from time to
22 time intercept individuals who are serving as couriers?
23 A. Yes.
24 Q. Would you explain to the jury what a courier is?
25 A. A courier is often, not always, but sometimes somebody who

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**68**

1  is not -- they're just somebody that's going to transport the
2  drugs. They don't know entirely every detail about the
3  organization involved. Sometimes -- they're often individuals
4  that intentionally would have as much information, just in case
5  they were caught. They would often be riding in vehicles not
6  registered to them.
7  Q. And what, if anything, does law enforcement do sometimes
8  when they find drugs in vehicles that are registered to persons
9  other than the individual who's serving as a courier?
10 A. We continue to investigate the case and try to find the
11 connection between the person registered with the vehicle and
12 the person that was caught.
13 Q. Let me ask it to you this way, Agent DeJohn. What benefit
14 would an individual gain by the use of a courier to transport
15 drugs?
16      MR. BRUNER: Objection. Speculation.
17      THE COURT: Overruled.
18 A. One, it puts them not being directly involved, should they
19 get caught. If they're using an individual that does not know
20 enough about the organization or if they're using an individual
21 that they trust that would lead law enforcement on another
22 track, they're able to do something by -- in this case, if the
23 vehicle belonged to somebody else, they can report it stolen.
24 And this individual may be able to take the fall for the vehicle
25 being stolen.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**69**

1  Q. And was this vehicle, the truck, reported stolen?
2  A. Yes. Not initially. Fifteen days -- no. Excuse me. About
3  seven days after we seized the vehicle and it was known that
4  several individuals had been arrested, this vehicle was reported
5  stolen out in Arizona by Rebecca Lara.
6  Q. Now, you said earlier that you searched the truck and you
7  found what we previously marked as Government Exhibit #3 and
8  Government Exhibit #4 and Government Exhibit #2 inside the
9  truck. Would you briefly explain to the jury what has been your
10 experience as a narcotics investigator as to what means or
11 methods individuals who are sending drugs by vehicle from one
12 place to another would use to conceal those drugs within
13 vehicles?
14 A. They -- there is a number of methods that are used.
15 Sometimes vehicles are -- they use the vehicle's natural
16 cavities, natural hidden areas within the vehicle to hide the
17 drugs. Sometimes vehicles are constructed in a manner where
18 they have additional concealed compartments added to these
19 vehicles. And they can get very simple or very complex. Some
20 of them use different pressure switches where you never get the
21 object open. You never know the drugs are there. Sometimes
22 they make these in a manner where they're vacuum-sealed. Once
23 it's closed -- you know, in effort to -- they think it's going
24 to try to keep the dogs from detecting the odor of narcotics.
25 In this particular case, the vehicle's natural cavities was used

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**70**

1  in order to hide the drugs.
2  Q. Now, I'm going to show to you what's been previously
3  marked -- and show the defense counsel first -- Government
4  Exhibit #5 and Government Exhibit #12.
5    (Brief pause)
6       MR. MOORER: And Your Honor, if I may approach the
7  witness to show him these two exhibits.
8  Q. Agent DeJohn, I'm showing you first what has been previously
9  marked as Government Exhibit #5. What is Government Exhibit #5?
10 A. It's a DEA evidence baggy with a label affixed to it. It's
11 containing DEA -- DEA Exhibit Number 9, which is Government
12 Exhibit #5, which was the two wrapped -- excuse me --
13 electrical-taped bundles of what was later to be determined
14 methamphetamine inside.
15 Q. And is Government Exhibit #5 the same materials that you
16 retrieved from the cavity of the pickup truck that you searched
17 on October the 8th?
18 A. Yes.
19 Q. And is it in the same or substantially similar condition as
20 when you submitted it for testing at the lab?
21 A. No.
22 Q. And what is different about it?
23 A. I sent it to the lab complete, as it was packaged, bundled
24 up in the tapes -- basically, two bundle -- black bundles and
25 bagged up. Once it's turned over to a chemist, the chemist does

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**71**

1  whatever it is they need to do to it to analyze it, which
2  requires breaking it down out of its package. Inside here there
3  is the evidence that was seized along with the tape that was
4  used to bundle up the evidence.
5  Q. But that is what you sent to the lab.
6  A. Yes.
7       MR. MOORER: And Your Honor, I offer, then, Government
8  Exhibit #5.
9       THE COURT: It's admitted.
10 Q. Now I'm showing to you Government Exhibit #12. Do you
11 recognize what Government Exhibit #12 is?
12 A. Yes.
13 Q. What is Government Exhibit #12?
14 A. It's going to be a DEA evidence baggy with a label affixed
15 to it stating DEA Exhibit Number 8, which is Government's
16 Exhibit #12. It contains a quantity of methamphetamine that I
17 submitted to the lab, along with its packaging.
18 Q. And is it in the same -- is this the same package that you
19 submitted to the lab?
20 A. Yes.
21      MR. MOORER: Your Honor, I offer Government Exhibit
22 #12.
23      THE COURT: It's admitted.
24 Q. And how did you obtain Government Exhibit #12 initially?
25 Where did it come from?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Sergio Ortiz Alcantar and Michael R. Marks    April 6, 2004

253

Middle District of Alabama. It's all about money. And these defendants decided that they would play a role in trying to obtain easy money.

The Judge is going to tell you about the law. But one of the things he's also going to tell you when you get the instructions from him is that you have to use your reason and your common sense to arrive at the conclusion that you have to make in this case, which is what are the facts of this case. You and only you as a jury, as a group, decide what the facts are. You're the judges of the truth. That's why we stand up when you come into the courtroom, because you are now judges, just as much as Judge Albritton is. Judge Albritton decides the law. He calls the balls and strikes, as we say in our business. But you decide the facts. And the facts are the most important part of the case. And the fact of the matter is the two individuals who are seated over there are guilty as they are charged in this conspiracy.

Now, I want you to look at some of the evidence when you get in the back and think these things over in your mind. But Mr. Lara had this conspiracy where he would bring these drugs out -- from out west to the Middle District of Alabama. And think about the evidence that you've got in this particular case. The reason I had Agent DeJohn look at the map and show you those routes on the map is because Mexico and Arizona -- Phoenix, Arizona, especially -- are source cities. That is

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Sergio Ortiz Alcantar and Michael R. Marks    April 6, 2004

254

where a large quantity of the methamphetamine in this country comes from. Sure, there are other places where you can get it; but Phoenix, California, Mexico, that area of the country is what we call a source location where a large portion of it comes from. And Mr. Lara, as part of this conspiracy, was bringing it himself and sending it himself.

You heard the testimony from the stand about Brian Bradley. And in particular, you also heard the testimony of Mr. Chaudhry. Now, some of these defendants through their lawyers in their openings and probably in their closings are going to talk about these people that we've had testify as cooperating witnesses. In fact, one of them, I think, said during the opening statements -- called them snitches and called them bad people and other things.

We're not presenting those witnesses to you to like them. We're not asking you to take them as your friends. But what we do know from the evidence or what you do know from the evidence is that these defendants elected to associate themselves with these individuals. Why would they do that? Because they were part and parcel of the drug trade. We didn't choose the people that they would deal with; they made that choice. We simply followed the evidence and presented it to you.

But the one person in this case who testified, Mr. Chaudhry, is a man who works in a hotel. He's living out

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Sergio Ortiz Alcantar and Michael R. Marks    April 6, 2004

255

the American dream. He's come to this country. He's plying a lawful trade. And as a person who works at night in a hotel -- think about it. People do rob hotels. He's got reason to pay attention to people who come in late at night. And he tells you he sees a person whom you now know from the evidence to be A. G., whom he had rented rooms to before; A. G., who had let other people use those rooms and was letting this defendant, Sergio, use the room on that particular evening, along with another individual. He rented that room to A. G. for these two individuals, and they came in after having gone out to the car.

And, of course, Mr. Chaudhry sees them at the car. They're under the hood working. And he thinks, well, maybe there is a problem with the car. Maybe that's what they're doing. Maybe they're trying to disable it in case somebody might decide to steal it. But he doesn't think anything of it much at that point other than he sees what happens. And then when the police come and the police end up searching that room, a room occupied by the defendant over here, and they don't find anything in the room, don't find any drugs in the room, it stands out enough to him that he says to the officers -- and they don't ask him, but he tells them the next day, y'all need to look under the hood, because I saw them working under the hood of the truck. Just a good citizen doing his duty to try to help where he can. He doesn't have a deal. He doesn't have a dog in the fight, as they say here. He's simply telling what he

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Sergio Ortiz Alcantar and Michael R. Marks    April 6, 2004

256

saw. And guess what? That's where they find the drugs, in a secret compartment in the vehicle.

I submit to you that the reason for the defendant's presence on that day was that he was a courier, that he was here helping to bring these drugs to the Middle District of Alabama so that these drugs could be distributed in the Middle District of Alabama. He is a long way from Mexico. You've got to decide, why was he here as opposed to being in Mexico where he was supposed to be? He was here because he was trying to get part of what he saw as easy money. This represents thousands of dollars, thousands. And he wanted a share of that criminal enterprise, which we call a conspiracy.

You're all familiar with conspiracies. We all conspire from time to time with people to do different things. It's just the things that you will conspire to do are not things against the law. In a conspiracy, you have some people who don't even know each other. That's why you don't have any direct evidence presented to you that these two defendants dealt with each other. You have individuals who are part of a conspiracy that involves a lot of people. Not everybody in the conspiracy knows everybody else. Not everybody in a conspiracy deals with everybody else. Part of that is because you want to compartmentalize your conspiracy so that if one person gets caught, they only know so much and they can't tell the whole story about everybody in the conspiracy.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

257

1   Different people in a conspiracy will have a different
2   role. So on this occasion at the Days Inn, the role that the
3   defendant was playing was that of a courier who's going to
4   courier the drugs which they had brought in; and then he was
5   going to courier the money that was coming in from the sale of
6   these drugs on October the 8th, only law enforcement was able to
7   intercept it ahead of time.
8       Now, Defendant Marks was part of this conspiracy as
9   well. One of the pieces of the evidence that I want you to look
10  at is the testimony that was presented on the stand by Defendant
11  Marks. And the Judge will instruct you that you can consider
12  his testimony and the testimony of any of the witnesses, and you
13  are the ones who decide who is telling the truth. But I submit
14  to you, why would he get on the stand and why would he present
15  other witnesses on the stand who tell you this story about them
16  going to try to find somebody who had beat up this woman who
17  testified? The reason they presented that false testimony to
18  you was because he is in fact guilty of what he's been charged
19  with doing.
20      Now, when you listened to the testimony of Officer
21  Yates, Officer Yates, in his business as a narcotics
22  investigator, has seen so many drug deals, so many drug deals.
23  And each of you in your own business, your own enterprise, have
24  certain things that you do in your business that because you're
25  involved in that business, you know. You know some things that

258

1   it would take someone who's not involved in your business, like
2   me or some of the other jurors, a long time to be able to see
3   what it is that you see and the inferences that you draw from
4   that.
5       You know, a simple one is like when is a cake done, you
6   know. There's different ways you can do that. To a person such
7   as me, who can't bake, you know, I can't just look at it like,
8   say, my wife can or my mother can or my sister can or some other
9   people that I know can. But when they're looking at it, they
10  see things that sometimes are hard to quantify, hard to be able
11  to relate to another person. It's just the kind of thing that
12  you develop a sense and a feel for over a period of time.
13      And that's what happened with Agent Yates on that day.
14  The reason he called for backup on that day to go ahead and take
15  this situation down, as we call it, to stop the illegal activity
16  that he saw occurring in front of him, was because he knew the
17  transaction was in progress. No, he didn't actually see the
18  money change hands at that point, because that money transfer
19  had happened ahead of that time. He didn't actually see the
20  dope transferred from hand to hand. But he saw the transfer.
21  He saw the -- he saw the situation developing right in front of
22  him. That's why he called for the backup and said the deal's
23  taking place right now. Let's go ahead and arrest.
24      And you know, the other evidence that you've got to
25  consider is what your common sense will tell you, the testimony

259

1   about what happened on that day, and then also some of the
2   things that didn't happen that you would have expected to
3   happen. There was no surprise, shock, registered by Defendant
4   Marks when the police came on that occasion. He was simply what
5   we call hinked up on that day. He had tried to get in touch
6   with A. G. and he couldn't, and he was nervous. He was nervous
7   because he didn't know what had happened to A. G. or the other
8   woman that he was trying to make contact with, the people that
9   he normally made contact with in relation to the drug trade. So
10  he was hinky. He was concerned. That doesn't mean that he
11  wasn't still part of the conspiracy. It simply means that he
12  was just nervous on this occasion.
13      And likewise, because we've all been there, you don't
14  know what he saw on that occasion. In other words, this
15  wouldn't be the first time that a person who's involved in an
16  illegal business might have seen what he thought was law
17  enforcement and momentarily stopped to see what was going on.
18  How many times have you been in a car where somebody's speeding
19  and they see a policeman or they come to a location where they
20  think a policeman might be, and they slow down? Same thing here
21  with this defendant on this occasion. Defendant Marks was
22  hinked up. Things weren't going the way they normally would
23  go. That explains his nervousness, his reticence, because
24  certainly he was not there for the reason that he explained to
25  you.

260

1   Now, if you look at the testimony from the young lady,
2   which I submit to you is just not believable, it's just not what
3   happened on that day. If somebody had beat her up and she was
4   concerned about it, the people to call was the police. And she
5   had done that, and she told you she had done that on a number of
6   occasions. And when she called, they came, they looked, they
7   did what you expect and pay the police to do. And she calls on
8   this occasion -- doesn't call the police, but calls a friend of
9   her father and her uncle's. Doesn't call her father. Doesn't
10  call her uncle, her other relatives. Supposedly calls this
11  defendant. I submit to you that story just does not hold
12  water. And why does it not hold water? It doesn't hold water
13  because it's not true. Why would she get on the stand and say
14  something like that that was not true? Why did he get on the
15  stand and say something that was not true? Why didn't she give
16  that information earlier? Because the defendant is guilty, and
17  she's trying to help him.
18      Jurors, you've had a lot of evidence presented to you.
19  It's been presented to you rather quickly. This isn't a case
20  where you've got a long period of time, where we've got hundreds
21  of exhibits. But the exhibits that we've presented, the
22  testimony that we've presented is important, and it is
23  compelling and it is convincing. So make those deductions and
24  conclusions that reason and common sense allow you to make and
25  in fact compel you to make, and that will show you that the

261

1   defendants are in fact guilty as they have been charged.
2         Now, one of the things that you will decide upon when
3   you do your deliberations will be the quantities.  The Judge
4   will give you sheets where in fact you will mark quantities to
5   find -- if you find the defendants guilty, the quantities of
6   methamphetamine that you find them responsible for.  I submit to
7   you that the evidence shows that they intended on each occasion
8   to possess 500 or more grams of methamphetamine and that you
9   should mark that block, because that is what the evidence
10  shows.  And it's an important finding that only you can make.
11  You heard the testimony from the chemist as she weighed each of
12  these exhibits.  You also heard the testimony from the
13  witnesses.  We talked about the quantities of methamphetamine
14  that they had possessed, that they intended to possess, and that
15  they in fact had possessed at different points and sold.
16        Now, the Judge will tell you the object of the
17  conspiracy does not have to be completed.  In other words, it's
18  the mere making of the agreement that a conspiracy consists of.
19  So if two individuals -- if you find that two individuals in
20  some way or manner came to an agreement to distribute drugs and
21  to possess those drugs with intent to distribute it and either
22  of these defendants join in on one occasion, no matter how
23  briefly and no matter how small their role was, then they are in
24  fact part of the conspiracy.  And I submit that each of these
25  defendants were part of the conspiracy and that Defendant Marks'

262

1   purpose in obtaining the methamphetamine that he got on that
2   occasion, October the 8th --
3         THE CLERK:  Three minutes.
4         MR. MOORER:  -- was to use that methamphetamine to sell
5   to other individuals here in the Middle District of Alabama and
6   elsewhere.  That was his role.  The other defendant's role was
7   to bring it here.  That's what the evidence shows.  That's what
8   the facts and your duty demands that you do, is convict each of
9   these defendants, because the evidence has shown them to be
10  guilty as they are charged in the indictment.
11        I appreciate you for the service that you have
12  rendered, are rendering, and will render.  These other lawyers
13  will have an opportunity to address you, and I will then again
14  have another opportunity to address you.  But bear in mind that
15  the fact of the case is that each of these defendants is guilty
16  as charged in the indictment.  Thank you.
17        THE COURT:  All right.  Mr. Bruner?
18        MR. BRUNER:  Thank you, Your Honor.  May it please the
19  Court, United States, members of the jury.
20        THE COURT:  Do you want to get the microphone?
21        MR. BRUNER:  Yes, sir.
22  (Brief pause)
23        MR. BRUNER:  Ladies and gentlemen, I appreciate your
24  attention too.  A jury is the common man.  That's the man on the
25  street.  That's why you're here.  We put 12 people together.

263

1   And someplace in England years ago, they decided that was the
2   number; that you put these 12 people together, what you're going
3   to get out of this synthesis when they discuss it is the common
4   man, the man on the street, the man that uses what we all call
5   common sense.  Common sense is what you have, and that's what
6   I'm going to ask you to use in making your decisions.
7         The main thing I want to talk to you about or the main
8   thing I want to ask you to do is listen to the Judge, and I know
9   you're going to do that.  But he's going to give you some
10  instructions; and these are very, very important instructions,
11  because you've all agreed when you -- when we went through the
12  voir dire process that you were going to follow the Judge's
13  instructions.  These are the instructions he's going to give to
14  you once all of us have finished talking with you.  We call them
15  jury charges.  But they are very important.
16        First thing I want to talk to you about is the
17  evidence, of course, or the lack of it, and what you should look
18  at as evidence.  I've told you before, I'm not very good with
19  all the bells and whistles in here.  I think Mr. Moorer or
20  Mr. Poti and people like that are probably better than me, so I
21  have to talk.  And I have to try to come up with things to try
22  to make you remember something, so I'm not going to put a big
23  picture on the board.  So when you go back to deliberate, I hope
24  you'll remember three things; and I'm going to go through these
25  three things.  Now, Mr. Moorer gets to speak with you again.

264

1   This is my only time.  So please listen to what I'm saying,
2   because I won't get to talk to you again.  It's certainly a
3   pleasure.
4         The first thing I want to talk with you about is
5   jargon.  Jargon is not evidence.  We've heard the various police
6   officers in here use various terminology, and some of you
7   probably don't know what it means.  Some of you probably think
8   you know what it means; I'm not sure.  But the fact is, it's
9   jargon.  Now, let me tell you what jargon is.  Jargon is the
10  specialized vocabulary and idioms of those in the same work.
11  It's police talk.
12        Police -- I have seen many of these cases.  They've
13  never watched anybody; they've had them under surveillance.
14  Sounds more impressive that way.  It also confuses me.  And let
15  me give you an example.  I was up in Blount County, had a police
16  officer testify.  And the gentleman kept saying I contacted
17  Officer Smith or someone on the Southern LINC.  Well, I didn't
18  know what the Southern LINC was.  I thought it was either a
19  railroad or a highway or something out there; and I'm trying to
20  figure out what they're talking about, because I'm not from
21  Blount County.  And it took about two and a half hours with this
22  witness, and I never knew what the Southern LINC was.  So I got
23  up, and I said -- when I got to ask him some questions, the
24  first thing I said was, look, I'm not from here; where is this
25  southern link?  And he kind of paused and he reaches down and he